**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Mario De La Fuente Manriquez, et al.,

   Plaintiffs,

v.

City of Phoenix, et al.,

   Defendants.

No. CV-11-1981-PHX-SMM

**MEMORANDUM OF DECISION AND ORDER**

   Pending before the Court is Defendants John Collins, Steve Garcia, Jack Harris, James Holmes, Jeff Kornegay, Lana Laker and the City of Phoenix's (collectively, unless otherwise specified "City Defendants") motion for summary judgment and accompanying statement of facts, which is fully briefed. (Docs. 148-49, 158-60, 174-75.) Also pending is Defendants Assistant Attorney General Ted Campagnolo and the State of Arizona's (collectively, unless otherwise specified "Campagnolo") motion for summary judgment and accompanying statement of facts, which is also fully briefed. (Docs. 151-52, 161-63, 173.) Finally pending is Plaintiffs' Mario De La Fuente Manriquez and Cecelia De La Fuente (collectively, unless otherwise specified "Manriquez") fully briefed motion for partial summary judgment and their accompanying statement of facts. (Docs. 154-55, 164-72.)

   After considering the parties' extensive briefing and having determined that oral argument is unnecessary,[1] the Court will grant in part and deny in part the City Defendants'

---

[1]Campagnolo's request for oral argument is denied because the parties have had an adequate opportunity to present their written arguments, and oral argument will not aid the Court's decision. See Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev., 933 F.2d

motion for summary judgment.  The Court will grant Campagnolo's motion for summary judgment and deny Manriquez's motion for partial summary judgment.

## BACKGROUND

The Court will provide a brief factual overview of this case and discuss the relevant facts more fully as they are necessary and pertinent to the issues presented by each parties' motion for summary judgment.

On February 2, 2008, Phoenix Police Detectives Jeff Kornegay and Karen Hughes conducted a routine liquor inspection at the Scorch Bar in North Phoenix.  (Doc. 149-1 at 10.)  After learning that a bar employee purchased liquor from an unauthorized vendor in violation of state law, the detectives conducted a more thorough inspection.  (Doc. 149-1 at 10-11.)  Detectives learned that persons other than the liquor license holder, Katie Peters, owned an interest in the bar. (Doc. 149-1 at 10-11.)  Detective Kornegay found documents that listed a Nazreth Derboghossian as the owner.   (Doc. 149-1 at 10-11.)   Further investigation into bank and other records revealed that Manriquez, over several years funded the establishment through the control of Derboghossian. (Doc. 149-1 at 11; Doc. 54 at 5.)

On November 23, 2009 and again on November 30, 2009, Assistant Attorney General Campagnolo presented evidence to the state grand jury.  (Doc. 155-2 at 16-17.)  Detective Kornegay was the sole witness to testify before the grand jury.  (Doc. 155-2 at 16-17.)  On November 30, 2010, the grand jury indicted Nazreth Derboghossian, Manriquez and his son, Jodi Upton, Katey Peters, Douglas Allen, Ara Derboghossian, and Nadia Zulema Lopez de Morales.  (Doc. 155-1 at 60-124.) The indictment covered various felony offenses including conspiracy, fraudulent schemes, participation in a criminal syndicate, illegal control of an enterprise, and money laundering.  (Doc. 54 at 8-9; Doc. 155-1 at 60-124.)

After securing the indictment, Phoenix Police Detectives Garcia and Borquez, presented a sworn affidavit to the Maricopa County Superior Court seeking authority to arrest suspects, as well as search and seize evidence from six persons, nine locations and

724, 729 (9th Cir. 1991).

1  thirty-three vehicles. (Doc. 149-1 at 4, 61-68.). After judicial review, the Maricopa County
2  Superior Court found probable cause and authorized the arrest and search warrants. (Doc.
3  149-1 at 74.)  The Phoenix Police Department lacked sufficient manpower to execute the
4  warrants in the various Phoenix, Tucson, and Nogales locations; therefore, it asked the
5  Arizona Department of Public Safety and the Pima County Sheriff's Office to assist them.
6  (Doc. 149-2 at 2-7.)  Manriquez was arrested at his home in Tucson on January 20, 2010.
7  (Doc. 54 at 11.)

8      During the pretrial phase of the criminal proceedings, Manriquez filed a motion to
9  remand or in the alternative to dismiss the grand jury indictment on the ground that the
10  State's grand jury presentation denied him his due process rights.  (Doc. 54 at 8.)  That
11  motion was granted on November 8, 2010, and the State did not appeal.  (Id.)  Ultimately,
12  the State did not seek reindictment of Manriquez due to the death of a critical witness.

13      Manriquez filed his original complaint in this action on September 20, 2011, in
14  Maricopa County Superior Court.  (Doc. 1-2, at 4.)  Defendants removed the case to this
15  Court on October 11, 2011. (Doc. 1.)  Manriquez filed his first amended complaint on
16  December 16, 2011. (Doc. 25.)  On April 12, 2012, Manriquez filed his second amended
17  complaint against the City of Phoenix, Kornegay (a City detective), Harris (the City's chief
18  of police), Collins (a City police lieutenant), Holmes (a City police department media
19  relations employee), Garcia (a City detective), Laker (a City police department media
20  relations employee), the State of Arizona, and Campagnolo (a State Assistant Attorney
21  General). (Doc. 54.) These Defendants are unchanged from the original and first amended
22  complaints, with the exception of Laker, who is named for the first time in the second
23  amended complaint. (See Docs. 1-2, 25.)  The second amended complaint alleges both
24  federal civil rights and state tort law violations. Manriquez's federal civil rights claims were
25  (1) malicious prosecution, (2) false arrest, (3) defamation relating to a press conference, (4)
26  defamation relating to a website posting, (5) excessive force, and (6) destruction of property.
27  Doc. 54, at 18-26. Manriquez's state tort claims included (7) malicious prosecution, (8)
28  defamation relating to a website posting, (9) false light invasion of privacy, (10) negligence,

1   (11) intentional infliction of emotional distress, (12) a federal civil rights claim of defamation

2   relating to a YouTube video entitled "The Last 24," wherein Laker describes the City

3   Defendants' investigation of Manriquez, and (13) a state tort claim of defamation relating to

4   "The Last 24" video.  (Doc. 54 at 26-36.)

5       Previously, this Court dismissed Count 2 (Doc. 110), Count 7 as to Defendants

6   Collins, Holmes and Garcia (Doc. 18), Count 8 (Doc. 18), Count 9 (Doc. 18), Count 10 (Doc.

7   18), Count 11 (Doc. 148), and Counts 12 and 13 as to Defendants Kornegay, Collins,

8   Holmes, Garcia, the State of Arizona, and Campagnolo (Doc. 89).

9                          **STANDARD OF REVIEW**

10      **Summary Judgment**

11      A court must grant summary judgment if the pleadings and supporting documents,

12  viewed in the light most favorable to the nonmoving party, "show that there is no genuine

13  issue as to any material fact and that the moving party is entitled to judgment as a matter of

14  law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

15  Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law

16  determines which facts are material. See Anderson v. Liberty Lobby, 477 U.S. 242, 248

17  (1986); see also Jesinger, 24 F.3d at 1130. "Only disputes over facts that might affect the

18  outcome of the suit under the governing law will properly preclude the entry of summary

19  judgment." Anderson, 477 U.S. at 248. The dispute must also be genuine, that is, the

20  evidence must be "such that a reasonable jury could return a verdict for the nonmoving

21  party." Id.; see Jesinger, 24 F.3d at 1130.

22      A principal purpose of summary judgment is "to isolate and dispose of factually

23  unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate

24  against a party who "fails to make a showing sufficient to establish the existence of an

25  element essential to that party's case, and on which that party will bear the burden of proof

26  at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir.

27  1994). The moving party need not disprove matters on which the opponent has the burden

28  of proof at trial. See Celotex, 477 U.S. at 323-24. The party opposing summary judgment

1   need not produce evidence "in a form that would be admissible at trial in order to avoid

2   summary judgment." <u>Id.</u> at 324.  However, the nonmovant may not rest upon the mere

3   allegations or denials of the party's pleadings, but must set forth specific facts showing that

4   there is a genuine issue for trial. <u>See</u> Fed. R. Civ. P. 56(e); <u>Matsushita Elec. Indus. Co., Ltd.</u>

5   <u>v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-88 (1986); <u>Brinson v. Linda Rose Joint Venture</u>,

6   53 F.3d 1044, 1049 (9th Cir. 1995).

7                                    **DISCUSSION**

8   **I.    Malicious Prosecution**

9           In Counts 1 and 7, Manriquez moves for partial summary judgment for his malicious

10  prosecution claims against Prosecutor Campagnolo and the City of Phoenix, Phoenix Chief

11  of Police Harris and Detective Kornegay ("City Defendants") arguing that these Defendants

12  lacked probable cause to pursue a grand jury indictment that resulted in his unconstitutional

13  arrest.  (Doc. 154 at 6-17.)

14          In Campagnolo's response and in his cross-motion for summary judgment, he

15  contends that he is absolutely immune due to his prosecutorial duties that culminated in his

16  decision that probable cause existed for charging Manriquez before the grand jury.  (Doc.

17  164; Doc. 151.)  In the City Defendants' response and in their cross-motion for summary

18  judgment, they likewise contend that they are entitled to immunity for the police report they

19  prepared and submitted because it is presumed that Prosecutor Campagnolo exercised

20  independent judgment in his subsequent determination that probable cause existed for

21  pursuing an indictment of Manriquez before the grand jury.  (Doc. 166; Doc. 148.)

22          The issue of whether any immunity prevents liability against either Campagnolo or

23  the City Defendants at this stage of the litigation is centrally important and will be resolved

24  here as a threshold issue.

25          *A. Prosecutor's Absolute Immunity*

26          Campagnolo contends that he is entitled to absolute immunity because his overall

27  actions in this case were intimately associated with the judicial phase of the criminal process.

28  (Doc. 151 at 10-14.)  According to Campagnolo, he only functioned in his official capacity

1  as a prosecutor in evaluating the evidence in the case and making the determination that

2  probable cause existed to bring the matter before the grand jury for a criminal indictment

3  naming Manriquez, among others.  (Id.)

4          Factually, Campagnolo stated that initially he met with Detective Kornegay to

5  approve and/or issue grand jury subpoenas. (Doc. 152-1 at 16, 51.)  Campagnolo was the

6  prosecutor that Kornegay presented the case to and from which Kornegay obtained grand

7  jury investigative subpoenas.  (Id. at 18.)  Campagnolo testified that he did not advise

8  Kornegay regarding any investigative tasks.  (Id. at 76, see also 152-1 at 18, 52, 56.)

9  Campagnolo himself testified that he did not perform any investigation.  (Id. at 52, 55.)

10  Kornegay explained his theory of Manriquez's culpability to Campagnolo. (Id. at 19-22, 31-

11  32, 37-39, 53, 62-63.)  Based upon the evidence provided to him by the police, Campagnolo

12  decided that there was both probable cause to believe Manriquez committed the offenses

13  alleged and a reasonable likelihood of conviction.  (Id. at 53, 62, 76.)  Campagnolo's

14  decision to pursue an indictment was approved by the Arizona Attorney General and Chief

15  Counsel of the Criminal Division.  (Id. at 56.)  On November 23 and 30, 2009, Campagnolo

16  presented evidence to a grand jury, during which Detective Kornegay was the only witness

17  to testify.  (Doc. 54 at 6.)  The grand jury indicted Manriquez.  (Id. at 8.)  Following

18  indictment, Campagnolo provided no input into the applications for search warrants and the

19  supporting affidavits, prior to judicial approval.  (Doc. 152-1 at 27, 54, 72.)

20          Manriquez contends that Campagnolo is not entitled to absolute immunity. (Doc. 161

21  at 3-9.) Based on Campagnolo's longstanding involvement in the investigation, which began

22  as early as February 2008, Manriquez argues that Kornegay and Campagnolo worked hand-

23  in-hand resulting in a joint investigation that tainted Campagnolo's independent judgment

24  that probable cause existed to seek an indictment. (Id., citing Harper v. City of Los Angeles,

25  533 F.3d 1010, 1027-28 (9th Cir. 2008.)  In support, Manriquez cites pre-indictment and

26  post-indictment facts showing the amount of cooperation between the Attorney General's

27  office and the City Defendants.  (Doc. 162-1 at 5-13, 36, 39-47, 49-52, 54-56.)

28  ///

*Legal Standard*

In Imbler v. Pachtman, 424 U.S. 409, 423-24 (1976), the Supreme Court established absolute immunity for the liability of prosecutors under 42 U.S.C. § 1983 who are engaged in activities intimately associated with the judicial phase of the criminal process. The principle of absolute immunity established in Imbler was based on the need to ensure sound decisionmaking by the prosecutor by protecting from fear of retaliatory suits due to vigorous law enforcement. Id. at 438 (stating that the judicial process would suffer from a rule permitting malicious prosecution suits against prosecutors because if suits for malicious prosecution were permitted, the prosecutor's incentive would always be not to bring charges). When determining whether a prosecutor is absolutely immune from suit for his conduct, the nature of the function performed is the standard for the analysis. See Kalina v. Fletcher, 522 U.S. 118, 127 (1997) (noting that prosecutorial immunity depends on "the nature of the function performed, not the identity of the actor who performed it"). The protections of absolute immunity extend only to advocative, prosecutorial functions, not to actions better described as administrative or investigative. See Botello v. Gammick, 413 F.3d 971, 976 (9th Cir. 2005) (citing Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993).

It is well-established that certain prosecutorial functions, such as the decision to initiate a prosecution or appear in court to present evidence in support of a search warrant application, are intimately associated with the judicial phase of the criminal process and thus entitled to absolute immunity. See Van de Kamp, 555 U.S. at 343-44. Further, absolute immunity attaches to "the types of activities . . . which . . . necessarily require legal knowledge and the exercise of related discretion." Id. at 344. Where a prosecutor is not acting as "'an officer of the court,' but is instead engag[ing] in other ... investigative or administrative tasks," he has no absolute immunity. Id. at 342 (quoting Imbler, 424 U.S. at 431).

Absolute immunity for prosecutorial functions also exists for claims brought pursuant to Arizona law. See, e.g., State v. Superior Court, 186 Ariz. 294, 297, 921 P.2d 697, 700 (App. 1996); Mulligan v. Grace, 136 Ariz. 483, 485, 666 P.2d 1092, 1094 (App. 1983).

"[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." <u>Burns v. Reed</u>, 500 U.S. 478, 486 (1991). Whether a public official or employee is entitled to absolute immunity is a question of law for the Court to determine. <u>Goldstein v. City of Long Beach</u>, 481 F.3d 1170, 1172 (9th Cir. 2007), *rev'd and remanded on other grounds*, <u>Van de Camp v. Goldstein</u>, 555 U.S. 335 (2009).

### Discussion–Prosecutor's Absolute Immunity

Clearly established law entitles Campagnolo to absolute immunity for his initiation and pursuit of a criminal prosecution. <u>See</u> <u>Buckley</u>, 509 U.S. at 269. Manriquez does not argue otherwise. Rather, Manriquez cites Campagnolo's pre and post-indictment activities as investigative or administrative in nature and thus not entitled to absolute immunity. (Doc. 161 at 3-9.) Specifically, he cites to subpoenas issued by Campagnolo and discussions Campagnolo had with Kornegay prior to the grand jury presentation. (<u>Id.</u>) Further, Manriquez argues that Campagnolo's pre-indictment activities between he and the City Defendants amounted to a joint investigation that tainted his independent judgment and decision to seek the criminal indictment. (<u>Id.</u>)

First, the Court finds that Campagnolo was entitled to absolute immunity for his pre-indictment issuance of subpoenas. Although the Court in <u>Buckley</u> stated that "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested," 509 U.S. at 274, the Court in <u>Van de Kamp</u> subsequently clarified that the types of activities which necessarily require legal knowledge and the exercise of related discretion are intimately associated with the judicial phase of the criminal process and entitled to absolute immunity. <u>See</u> 555 U.S. at 344. Here, Campagnolo's legal knowledge and his exercise of related discretion were essential in order for Campagnolo to issue pre-indictment grand jury subpoenas. (Doc. 162-1 at 49-52.)

Second, the Court finds that Campagnolo was entitled to absolute immunity for his meetings with Detective Kornegay to receive investigative updates. The Supreme Court has established absolute prosecutorial immunity for the initiation and pursuit of a criminal

prosecution. <u>Imbler</u>, 424 U.S. at 421. "[T]he duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom," and are nonetheless entitled to absolute immunity." <u>Id.</u> at 431 n.33. In the course of preparing for the initiation of the criminal process and for trial, a prosecutor is required to obtain, review, and evaluate evidence. <u>Id.</u>; <u>see also</u> <u>Roe v. City & County of San Francisco</u>, 109 F.3d 578, 584 (9th Cir. 1997) (stating that a prosecutor's professional evaluation of the evidence assembled by police is entitled to absolute immunity). Here, Campagnolo's meetings with Detective Kornegay in preparing for grand jury proceedings and trial occurred in the course of his role as an advocate for the State and are entitled to the protections of absolute immunity.

Although Manriquez cites <u>Harper</u> for the proposition that a prosecutor's independent judgment can be tainted when he becomes jointly involved in the day-to-day investigation of a matter, the facts in <u>Harper</u> are easily distinguishable from the facts here. (Doc. 161 at 6, citing <u>Harper</u>, 533 F.3d at 1027-28.) <u>Harper</u> concerned whether a police officer taskforce would be entitled to qualified immunity for pressuring the prosecutor into filing criminal charges resulting in arrests without probable cause; it did not involve the issue of absolute immunity for the prosecutor.

Finally, the only post-indictment conduct relied upon by Manriquez is the correspondence between Kornegay and Campagnolo after the indictment had been remanded. Campagnolo asked questions of Kornegay regarding liquor licensing statutes and Kornegay provided his input. The result of this interaction was Campagnolo preparing and submitting a supplemental brief to the Maricopa County Superior Court. Campagnolo's filing a legal pleading in the superior court is protected by absolute immunity, as well as the legal interactions which precipitated its filing. <u>See</u> <u>Van Kamp</u>, 555 U.S. at 342-44.

Therefore, the Court finds that Campagnolo is entitled to absolute immunity because his overall actions in this case were intimately associated with the judicial phase of the

criminal process.[2]  See Imbler, 424 U.S. at 423-24.

    B.  *City Defendants' Immunity*

    The City Defendants argue that Detective Kornegay's grand jury testimony is absolutely immune from liability, that Detective Kornegay and Chief of Police Harris are otherwise entitled to immunity because  Prosecutor Campagnolo independently determined that there was probable cause to pursue a grand jury indictment, and alternatively, based on the police report and underlying evidence, that the City Defendant Kornegay properly determined probable cause did exist for Manriquez's arrest. (Doc. 148 at 5-8.) Consequently, for Claim 7, because the individual City Defendants are entitled to immunity, the City of Phoenix argues that there are no facts supporting independent wrongdoing by it and so it is also entitled to be dismissed on Claim 7.  (Id.)

    Manriquez does not dispute that Detective Kornegay's grand jury testimony  is entitled to immunity.  (Doc. 158 at 3.)  Rather, Manriquez argues that Kornegay's liability is due to prior conduct during which he functioned as the lead investigator in the criminal case.  (Id.)  In this capacity, Manriquez contends that the following conduct subjects Kornegay to liability: 1) his regular communications with Campagnolo; 2) his requests to Campagnolo to review and sign subpoenas; 3) his decision not to subpoena potentially exculpatory evidence; 4) his decision not to question Manriquez; 5) his encouragement to Campagnolo to bring certain criminal charges against Manriquez; and 6) his providing of legal advice, albeit erroneous, to Campagnolo at Campagnolo's request concerning the legal

---

    [2]Manriquez concedes that he cannot hold the State of Arizona liable for the actions of Mr. Campagnolo through *respondeat superior*. (Doc. 161 at 11.)  In § 1983 litigation, a local governmental unit such as the State may not be held responsible for the acts of its employees under a *respondeat superior* theory of liability.  See Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  However, Manriquez continues his argument that the State of Arizona is responsible for Campagnolo's conduct regarding his state tort count of malicious prosecution. (Doc. 161 at 11.)  The Court has already found that Campagnolo is entitled to absolute immunity on this claim because his overall actions in this case were intimately associated with the judicial phase of the criminal process.  Therefore, the State of Arizona will be dismissed from both Counts 1 and 7.

1    basis for the prosecution of Manriquez.  (Id. at 3-6.)

2        *Legal Standard*

3        It is a well-settled principle that the "[f]iling of a criminal complaint immunizes

4    investigating officers . . . from damages suffered thereafter because it is presumed that the

5    prosecutor filing the complaint exercised independent judgment in determining that probable

6    cause for an accused's arrest exists at that time." Smiddy v. Varney, 665 F.2d 261, 266 (9th

7    Cir. 1981); see Beck v. City of Upland, 527 F.3d 853, 862 (9th Cir. 2008) (stating that a

8    prosecutor's independent judgment breaks the chain of causation between allegations of

9    unconstitutional actions by city officials and the harm suffered by a constitutional tort

10   plaintiff).  A plaintiff may rebut this presumption, however, by "showing that the district

11   attorney was pressured or caused by the investigating officers to act contrary to his

12   independent judgment." Smiddy, 665 F.2d at 266.  Such evidence must be substantial. See

13   Newman v. County of Orange, 457 F.3d 991, 994–95 (9th Cir. 2006) (stating that prosecutors

14   are entitled to rely on police reports not the suspect's own version of the events when

15   deciding whether charges should be filed and thus the suspect's version cannot by itself serve

16   as evidence that the officers interfered with the prosecutor's decision).  However, in Barlow

17   v. Ground, 943 F.2d 1132, 1136 (9th Cir. 1991), the court found such a showing was

18   established when police officers made false reports to the prosecutor, omitted material

19   information in their reports, and thus otherwise prevented the prosecutor from exercising his

20   independent judgment.  Id.  Once the plaintiff has introduced evidence to rebut the

21   presumption, the burden remains on the defendant to prove that an independent intervening

22   cause cuts off his tort liability. Beck, 527 F.3d at 863.

23       *Discussion–Police Officer Immunity*

24       In order to rebut the presumption that the prosecutor's exercised independent

25   judgment in pursuing a grand jury indictment, the Court will summarize Manriquez's

26   arguments, as follows: 1) Kornegay's "hand-in-hand relationship" with Campagnolo

27   amounted to a joint investigation of Manriquez; 2) Kornegay's, and/or other police officials,

28   purposeful omission of potentially exculpatory information from the police report and lack

1   of questioning of Manriquez prevented the prosecutor from exercising his independent

2   judgment; and 3) Kornegay pressured Campagnolo into bringing criminal charges against

3   Manriquez.  (Doc. 158 at 3-6.)

4        The Court has already reviewed much of the evidence that Manriquez puts forward

5   in his attempt to establish that the prosecutor was compromised and lacked independent

6   judgment.  First, based on a lack of evidence, the Court rejects Manriquez's conclusory

7   contention that Campagnolo was working hand-in-hand with Detective Kornegay, in what

8   the Court should deem a joint investigation.  (Doc. 158 at 3-6.)  In support, Manriquez cites

9   Harper in support, but Harper established that there was a day-to-day contact between the

10  investigative task force and the prosecutor.  See Harper, 533 F.3d at 1027-28.  Here,

11  Manriquez relies only on Campagnolo signing a few grand jury subpoenas and deposition

12  testimony that Campagnolo sat in on a few investigative meetings at the police station.  This

13  is far from the daily interaction cited in Harper in which the investigators "ongoing daily

14  interactions with the District Attorney's office were instrumental" in the suspect's arrest.  Id.

15  It was this type of daily interaction that led the Harper court to conclude that the investigators

16  and the prosecutor were "engaged in an essentially joint investigation."  Id. at 1028.  In

17  addition, Manriquez cites email correspondence from November 2010 between Kornegay

18  and Campagnolo in which Campagnolo enlisted Kornegay's liquor license expertise in order

19  to respond to Manriquez's motion to dismiss or remand the indictment.  (Doc. 158 at 5-6.)

20  Manriquez states that this supports his argument that Kornegay and Campagnolo were

21  working together in a "joint investigation."  The Court rejects Manriquez's argument; this

22  correspondence took place one year after Manriquez was indicted by the grand jury; it only

23  shows that Campagnolo sought Kornegay's input due to his expertise in liquor license

24  enforcement so that Campagnolo could completely respond to Manriquez's motion to dismiss

25  or remand the indictment.

26        Next, regarding the argument that Kornegay and/or other police officials purposely

27  omitted potentially exculpatory information from the police report provided to Campagnolo,

28  and chose not to question Manriquez as part of their investigation, Manriquez cites

1   Kornegay's deposition where Kornegay admitted that prior to the convening of the grand jury
2   he chose to not to subpoena records from Manriquez personally.  (Doc. 159-2 at 34-35.)
3   Manriquez argues that if Kornegay had, he would have obtained another 2001 loan document
4   between Nazreth Derboghossian and Manriquez, in addition to the loan document he
5   obtained from Manriquez's accountant, Stephen Bond.  (Doc. 159-2 at 20-21; Doc. 149-1 at
6   44-46; Doc. 159-5 at 17-19.)  Manriquez argues that this 2001 loan document would have
7   shown that he did not have control or substantial involvement with Nazreth Derboghossian;
8   he only provided loans to him.  (Doc. 158 at 3-4.)

9        In <u>Newman</u>, the Ninth Circuit found that prosecutors are entitled to rely on police
10  reports not the suspect's own version of events when deciding whether charges should be
11  brought.  <u>See</u> 457 F.3d at 994-95.  Thus, Kornegay's choice not to interview one of the
12  suspects, Manriquez, was not a material omission from the police investigation.  Regarding
13  Kornegay's failure to subpoena the initial 2001 loan documents that existed between he and
14  Nazreth Derboghossian before pursuing charges before the grand jury, this argument is also
15  without merit.  Prior to presenting the case to Campagnolo, Kornegay, through Manriquez's
16  accountant, Stephen Bond, knew the terms of the financing agreement detailing that
17  Manriquez had provided Derboghossian more than 16 million dollars since 2001.  (Doc. 159-
18  2 at 20-21; Doc. 149-1 at 44-46; Doc. 159-5 at 17-19.)  Based on Kornegay's interview with
19  Bond, Kornegay knew that Manriquez was aware that providing financing to Derboghossian
20  involved Exotic Auto Sales as well as Derboghossian's business relationships with
21  nightclubs and liquor licenses.  (Doc. 149-1 at 44-47.)  The Court finds that Kornegay's
22  failure to obtain this additional 2001 loan information from Manriquez was not a material
23  omission as it pertained to the investigative information Kornegay had already turned over
24  to Campagnolo.  <u>See</u> <u>United States v. Williams</u>, 504 U.S. 36, 52-53 (1992) (stating that a
25  prosecutor does not have a duty to present exculpatory evidence to a grand jury when seeking
26  an indictment).

27       Finally, regarding Kornegay's alleged pressure upon Campagnolo to bring charges
28  against Manriquez, Manriquez relies on emails Kornegay forwarded to Campagnolo on

1   August 18, 2009 listing additional charges he wanted brought and again on September 8,

2   2009 where he provided Campagnolo with a revised outline of charges that should be listed

3   on the Indictment.  (Doc. 158 at 4.)

4       First, Campagnolo testified at his deposition that he exercised independent judgment

5   in filing criminal charges against Manriquez.  Campagnolo further testified that he believed

6   there was both probable cause and a reasonable likelihood of conviction. (Doc. 175-1 at 24-

7   25.)  Although Manriquez points to emails between Kornegay and Campagnolo discussing

8   possible additional charges, these possible additional charges were not against Manriquez,

9   but against Nazreth Derboghossian, Doug Allen, and Jodi Upton.  (See Doc. 159-3 at 31-32,

10  34-35.)  Further, Campagnolo's email response shows that he rejected some of Kornegay's

11  recommended additional criminal charges due to the running of the statute of limitations.

12  (Id.)  Campagnolo's response further confirms that he exercised independent judgment in

13  determining what criminal charges would be brought in the indictment.  (Id.)

14      Therefore, the Court finds that Campagnolo exercised independent judgment in

15  determining that probable cause for Manriquez's arrest existed at that time he pursued

16  charges before the grand jury.  Based on the prosecutor's independent judgment, the City

17  Defendants are entitled to immunity; Manriquez did not rebut the presumption demonstrating

18  that the City Defendants caused Campagnolo to act contrary to his independent judgment.

19      The Court has found that both Prosecutor Campagnolo and Detective Kornegay are

20  entitled to immunity as to both Count 1 and Court 7.  Further, Detective Kornegay and Chief

21  of Police Harris are otherwise entitled to immunity because Prosecutor Campagnolo

22  independently determined that there was probable cause to pursue a grand jury indictment.

23  Based on these findings, there are no facts supporting independent liability by the City of

24  Phoenix and it will be dismissed from Claim 7, the state-law malicious prosecution claim.

25  Because both Prosecutor Campagnolo and the individual City Defendants are entitled to

26

27

28

immunity, the Court will further deny as moot and dismiss Claims 1 and 7.[3]

## II.   Search and Seizure

In Counts 5 and 6, Manriquez alleges that the law enforcement officers executing the arrest and search warrants used excessive force and destroyed their property in violation of the Fourth Amendment (Doc. 54 at 24-25.)

All City Defendants contend that they are entitled to summary judgment because Manriquez fails to allege City Defendants' personal participation in support of his 42 U.S.C. § 1983 allegations of an unconstitutional search and seizure.  Citing Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989), City Defendants assert that § 1983 liability arises only upon a showing of the defendant's personal participation.  Alternatively, City Defendants move for summary judgment regarding Counts 5 and 6 contending that only reasonable force was exercised in Manriquez's arrest and that the manner in which they executed the search warrant was reasonable.  (Doc. 148 at 8-11.)

Specifically, Manriquez contends that the use of SWAT teams to execute the arrest and search warrants was in itself a Fourth Amendment excessive force violation.  (Doc. 158 at 6-9.)  Regarding his failure to allege personal participation, Manriquez reargues that he was diligent in seeking to amend his complaint to name the officer requesting that SWAT teams execute the search and seizure warrants.  (Doc. 158 at 7.)  Alternatively, Manriquez contends that City Defendants unreasonably used excessive force in his arrest and that they unreasonably seized–in fact destroyed his property–by the manner in which they executed the search warrant.  (Doc. 54 at 24-25; Doc. 58 at 6-8.)

*Discussion*

In Taylor, 880 F.2d at 1045, the Ninth Circuit found that the plaintiff failed to

---

[3]Because the City Defendants prevailed on their threshold immunity argument, the Court need not resolve the City Defendants' further arguments that Manriquez failed to allege City Defendants' personal participation in his 42 U.S.C. § 1983 Fourth Amendment malicious prosecution allegations or Manriquez's allegation that he was unlawfully arrested without probable cause.

1    establish a genuine issue of material fact as to the personal involvement of any of the named

2    defendants.  Id.  The court went on to require that pursuant to § 1983, liability arises only

3    upon a showing of personal participation by the defendant.  Id.

4         It is undisputed that it was Phoenix Police Sergeant Mark Doty, and not any of the

5    City Defendants, who requested that SWAT teams carry out the arrest warrant for Manriquez

6    and the search warrant authorizing seizure of certain property at his homes.  (Doc. 149-2 at

7    2-7; see also Doc. 149-1 at 4-74.)  The Court has already denied and refused reconsideration

8    of Manriquez's late motion to amend his complaint to add Sergeant Doty.  (Docs. 103, 105-

9    06, 109.)  Although this Court has already thoroughly discussed why Manriquez was not

10   diligent in seeking amendment of his complaint, Manriquez again reargues justification for

11   seeking a late amendment to his complaint. (Doc. 158 at 7.)  The Court will not rethink what

12   it has already thought through–rightly or wrongly.  See Defenders of Wildlife v. Browner,

13   909 F. Supp. 1342, 1351 (D. Ariz. 1995).

14        Next, Manriquez argues that the City of Phoenix often uses a SWAT team to carry out

15   arrest and search warrants.  (Doc. 158 at 7.)  However, such argument does not create a

16   genuine issue of material fact for this particular case.  Here, it is undisputed that Phoenix

17   Police Sergeant Mark Doty requested that members of the Pima County Regional SWAT

18   team and the Department of Public Safety SWAT team carry out the arrest warrant for

19   Manriquez and the search warrant authorizing seizure of certain property at his homes.  (See

20   Doc. 149-2 at 2-7; Doc. 158 at 7.)  Manriquez fails to allege any of the City Defendants'

21   personal participation regarding his claim of unconstitutional search and seizure.

22        The Court will grant City Defendants' motion for summary judgment on Counts 5 and

23   6 because Manriquez fails to establish a genuine issue of material fact as to the personal

24   involvement of any of the City Defendants regarding the decision requesting that SWAT

25   teams carry out the arrest warrant for Manriquez and the search warrant authorizing seizure

26   of certain property at his homes.  Liability under section 1983 arises only upon a showing

27   of personal participation by the defendant. See List, 880 F.2d at 1045.  Therefore, the Court

28   will enter judgment in favor of City Defendants on Counts 5 and 6.

**III.    Defamation**

     A.  Federal Civil Rights Defamation

     In Counts 3, 4 and 12, the second amended complaint alleges that following his unconstitutional arrest, Manriquez was defamed at the City's press conference, by an article posted on the City's website, and by a City-produced video that was uploaded to You Tube. (Doc. 54.)

     *City Defendants' Motion for Summary Judgment*

     Relying upon Paul v. Davis, 424 U.S. 693, 698 (1976), City Defendants–the City of Phoenix, Phoenix Police Chief Harris and Phoenix Police Officer Laker–move for summary judgment on Counts 3, 4 and 12[4] arguing that Manriquez only alleges a constitutionally protected interest in his reputation.  (Doc. 148 at 12.)  Therefore, City Defendants argue that they are entitled to summary judgment under the "stigma-plus" test for federal civil rights defamation claims because Manriquez fails to plead defamation plus a required constitutional violation.  (Id.)  According to City Defendants, Manriquez fails to state a *prima facie* claim for defamation-plus by alleging defamation in connection with a federally protected right, that being his allegation that he was arrested without probable cause because both a grand jury and a state court judge determined that probable cause existed for Manriquez's arrest and therefore his arrest was not unconstitutional.

     Manriquez contends that he meets the stigma-plus test as the defamation he suffered was inflicted in connection with his federally protected right, that being his unconstitutional arrest in violation of the Fourth Amendment.  (Doc. 158 at 9.)  Citing Cooper v. Dupnik, 924 F.2d 1520 (9th Cir. 1991), City Defendants reply that Manriquez's alleged defamation was not accompanied by an injury directly caused by the Government and therefore Manriquez

---

[4]For Counts 3, 4 and 12, City Defendants reargue that Manriquez failed to file suit within the two-year statute of limitations for federal civil rights claims under 42 U.S.C. § 1983.  The Court has already denied this argument.  (Doc. 89 at 6-7.)  The Court denies reconsideration of this issue.  See Defenders of Wildlife, 909 F. Supp. at 1351 (stating that reconsideration should not be used to ask the Court to rethink what the Court had already thought through-rightly or wrongly).

1    does not meet the stigma-plus test.  (Doc. 174 at 8-9.)

2         *Legal Standard*

3         An action for damage to reputation ordinarily "lies . . . in the tort of defamation, not

4    in [42 U.S.C. § ] 1983."  Fleming v. Dep't of Public Safety, 837 F.2d 401, 409 (9th Cir.

5    1988).  Damage to reputation alone is not actionable under § 1983.  Hart v. Parks, 450 F.3d

6    1059, 1069 (9th Cir. 2006). "To recover damages for defamation under § 1983, a plaintiff

7    must satisfy the 'stigma-plus test.'" American Consumer Pub. Ass'n, Inc. v. Margosian, 349

8    F.3d 1122, 1125-26 (9th Cir. 2003) (quoting Cooper v. Dupnik, 924 F.2d 1520, 1532 (9th

9    Cir. 1991), rev'd on other grounds, 963 F.2d 1220, 1235 n.6 (9th Cir. 1992) (en banc)).

10   "Under that test, 'a plaintiff must allege loss of a recognizable property or liberty interest in

11   conjunction with the allegation of injury to reputation.'" Id. at 1126 (quoting Cooper, 924

12   F.2d at 1532). This would include, for example, loss of a job as a result of defamatory

13   statements. See Hart, 450 F.3d at 1069. The injury must be to a "previously recognized right

14   or status." WMX Tech., Inc. v. Miller, 80 F.3d 1315, 1319 (9th Cir. 1996) (citing Paul, 424

15   U.S. at 711. Further, "the 'stigma-plus test' requires that the defamation be accompanied by

16   an injury directly caused by the Government, rather than an injury caused by the act of some

17   third party [in reaction to the Government's defamatory statements]." Id. at 1320. "There are

18   two ways to state a cognizable § 1983 claim for defamation-plus: (1) allege that the injury

19   to reputation was inflicted in connection with a federally protected right, or (2) allege that

20   the injury to reputation caused the denial of a federally protected right." Herb Hallman

21   Chevrolet, Inc. v. Nash–Holmes, 169 F.3d 636, 645 (9th Cir. 1999).

22        *Discussion*

23        The Court agrees with City Defendants.  Under the Fourth Amendment, an arrest

24   made upon probable cause with a warrant is not unconsitutional.  Whether an arrest is

25   unconstitutional under the Fourth Amendment is determined at the time the arrest is made.

26   In this case, the facts establish that a grand jury found probable cause for Manriquez to be

27   indicted (Doc. 155-1 at 60-124), and after judicial review of the application for an arrest

28   warrant (Doc. 149-1 at 4-74, a state court judge determined that probable existed to issue an

1    arrest warrant for Manriquez.  (Id.)  The alleged defamation took place shortly after

2    Manriquez's constitutional arrest under the Fourth Amendment.

3         Under Cooper, a § 1983 defamation plus claim was stated where plaintiff alleged

4    police officers made defamatory statements at a press conference that arose out of his

5    "*unconstitutional*" arrest.  See Cooper, 924 F.2d 1534-36 (stating that the police chief's

6    defamatory statements were intertwined with the arrest of Cooper and Cooper's

7    unconstitutional arrest constitutes the necessary "plus" of the stigma-plus requirement).

8    Thus, absent an unconstitutional arrest, Manriquez fails to establish a *prima facie* stigma-plus

9    defamation case.  Therefore, the Court will grant the individual City Defendants' motion for

10   summary judgment on Counts 3, 4 and 12 based on their contention that Manriquez failed

11   to state a § 1983 stigma-plus defamation claim.  Based on these findings, there are no facts

12   supporting independent liability by the City of Phoenix and it will be dismissed from Claims

13   3, 4 and 12, the federal civil rights defamation claims.

14        B.  State Tort Defamation[5]

15        *Manriquez Motion for Partial Summary Judgment*

16        In Count 13, Manriquez alleges that Phoenix Police Officer Lana Laker, Police Chief

17   Jack Harris and the City of Phoenix defamed him under state law in their production and

18   public presentation of a video entitled: The Last 24, which became a You Tube video,

19   accessible on the World Wide Web.  (Doc. 54 at 34-36.)  Regarding Count 13, Manriquez

20   again moves for partial summary judgment on the first three elements of his Arizona

21   defamation claim:  (1) a false statement concerning the plaintiff; (2) the statement was

22   defamatory; and (3) the statement was published to a third party.  (Doc. 154 at 17, citing

23   Morris v. Warner, 160 Ariz. 55, 62, 770 P.2d 359, 366 (App. 1998).)  Manriquez reiterates

24   that the final two elements of his Arizona defamation claim, (4) the requisite fault on the part

25   _____

26        [5]Regarding Claim 13, City Defendants reargue that Manriquez failed to: 1) timely
     serve his notice of claim, and 2) timely file the claim within the applicable state statute of
27   limitations.  The Court has already denied these arguments.  (Doc. 89 at 4-6.)  The Court
     denies reconsideration. See  Defenders of Wildlife, 909 F. Supp. at 1351.
28

of the defendant; and (5) how the plaintiff was damaged as a result of the statement, are factual questions for the jury. (Id.) Manriquez alleges that these three elements of state-law defamation were established in the video the City of Phoenix uploaded to You Tube. (Doc. 154 at 24-25.)

Manriquez asserts that the following statements in the City-produced video were false and defamatory:

> Defendant Laker . . . stated inter alia the following: (1) The Phoenix Police Department's investigation exposed a criminal enterprise which was financially funded by [Manriquez] and which operated car dealerships by fraudulent means []; and (2) That members of the enterprise used their financial accounts to carry out fraud against victims by issuing fraudulent MVD titles and failing to pay off loans and consignment agreements.[] In the video, [Manriquez] was lumped together with the other members of the alleged criminal syndicate and accused of multiple crimes for which he was not even indicted. [Manriquez's] "mug shot" was shown and he was identified as a member of a "criminal enterprise"[], and photographs of [Manriquez's] two homes were displayed[].

(Doc. 154 at 25, citing (Doc. 155-3 at 35 and Doc. 155-3 at 36 ("The Last 24" Video).) The Court has already found that Laker was acting within the scope of her employment and that Defendant Harris otherwise directly or indirectly approved the making of, dissemination, publication and uploading of the video. (Doc. 89 at 8.)

Harris, Laker and the City respond that under Arizona law, when a plaintiff claims defamation against public officials, he must additionally prove objective malice to overcome the public official's right to qualified immunity, citing Goddard v. Fields, 214 Ariz. 175, 178, 150 P.3d 262, 265 (App. 2007). (Doc. 166 at 6.) Harris, Laker and the City contend first that the police officers at issue are public officials, and second that they are entitled to the protections of qualified immunity regarding the defamation claims raised against them. (Id.)

The Court finds that police and other law enforcement personnel are classified as public officials. See Godbehere v. Phoenix Newspapers, Inc., 162 Ariz. 335, 343, 783 P.2d 781, 789 (1989). Therefore, the police officials at issue are entitled to qualified immunity. Consequently, Manriquez must additionally prove objective malice to overcome the public official's right to qualified immunity. Under the objective malice standard, "qualified immunity will protect a public official if the facts establish that a reasonable person, with the

1    information available to the official, could have formed a reasonable belief that the

2    defamatory statement in question was true and that the publication was an appropriate means

3    for serving the interests which justified the privilege." W. Tech., Inc. v. Neal, 159 Ariz. 433,

4    438, 768 P.2d 165, 170 (App. 1988) (further citation omitted).

5         Harris, Laker and the City further contend that the matters asserted in the video are

6    true and that such truth is an absolute defense to defamation.  (Doc. 166 at 6.)  They contend

7    that it is true that Manriquez funded the operation, loaning Nazreth Derboghossian more than

8    16 million dollars, that Derboghossian was convicted, that Manriquez was a suspect in these

9    activities, and that Manriquez bears responsibility for being associated with the now-

10   convicted Derboghossian.  (Id. at 7.)

11        Manriquez replies that the video lumped him in with other criminal defendants and

12   accused him of committing multiple crimes for which he was not charged.  (Doc. 168 at 6.)

13   Specifically, that the suspects operated several local car dealerships by fraudulent means, that

14   the suspects carried out the fraud by issuing fraudulent MVD titles and failing to pay off

15   loans and consignment agreements, and that the suspects were indicted on 102 felony counts

16   stemming from the investigation.  (Id.)  Manriquez contends that such statements were false

17   because no one suspected that he fraudulently operated the car dealerships or issued

18   fraudulent MVD titles, or failed to pay off loans, or that he was charged with 102 felony

19   counts as stated.  (Id. at 6-7.)

20        *Legal Standard*

21        Substantial truth is sufficient to defeat an action for defamation.  Fendler v. Phoenix

22   Newspapers, Inc., 130 Ariz. 475, 479, 636 P.2d 1257, 1261 (App. 1981).  "It is well settled

23   that a defendant is not required in an action of libel to justify every word of the alleged

24   defamatory matter; it is sufficient if the substance, the gist, the sting of the libelous charge

25   be justified, and if the gist of the charge be established by the evidence, the defendant has

26   made his case." Id. at 479, 636 P.2d at 1261 (further citation omitted).  Further, it is settled

27   law that police officers may draw on their own experience and specialized training to make

28   inferences from and deductions about the cumulative information available to them that

1    might well elude an untrained person.  See United States v. Hernandez, 313 F.3d 1206, 1210

2    (9th Cir. 2002) Officers are entitled to draw their inferences based on cumulative

3    information.  Id.  Behavior that may appear innocent when stripped of context, may not

4    appear so when viewed in the light of the aggregate evidence.  See Hart v. Parks, 450 F.3d

5    1059, 1067 (9th Cir. 2006).

6        *Discussion*

7        The Phoenix Police Department's ("PPD") Public Affairs Bureau produced a video

8    entitled "The Last 24" for its continuing You Tube program.  (Doc. 155-3 at 35; Doc. 54 at

9    31.) The program discussed the DeLafuente/Deboghossian investigation and the subsequent

10   indictment.  (Doc. 155-3 at 35.)  In the video, City Defendant Lana Laker describes the

11   PPD's investigation that led to the arrest and indictment of Manriquez.  (Id.)  Specifically,

12   Laker states that the PPD's investigation exposed a criminal enterprise under the control of

13   Nazreth Derboghossian and financially funded by Manriquez which operated car dealerships

14   by fraudulent means.  (Id.)  Laker praises the PPD detectives for bringing members of the

15   criminal syndicate to justice.  (Id.)  The video was made on January 25, 2010, uploaded to

16   You Tube on January 28, 2010, and removed sometime between February 2, 2012 and

17   February 20, 2012.  (Doc. 89 at 3.)

18       The Court views the facts in the light most favorable to the non-moving party, the

19   police officers at issue.  The Court has reviewed a transcript of the video and the video

20   presentation which were submitted into evidence.  (Doc. 155-3 at 35 and Doc. 155-3 at 36

21   ("The Last 24" Video).)  The video was produced and uploaded to the web onto You Tube

22   within approximately one week after Manriquez was arrested.  (Doc. 54 at 11, 32.)  Taken

23   in the light most favorable to the non-moving party, the Court first finds that the statements

24   are substantially true.  When viewed in context, the gist, the substance of the commentary

25   at issue revolves around the suspects that were indicted and arrested.  It is true that

26   Manriquez was named, and that his picture was posted on the video, but it is also true that

27   he funded Nazreth Derboghossian, who was subsequently convicted of numerous felonies.

28   (Doc. 149-2 at 11.)  It is substantially true that the charges presented was due to Manriquez's

association with, and long-time funding of Derboghossian's illegal activities, which funding amounted to over 16 million dollars.  Based on an interview with Stephen Bond, Manriquez's accountant, the affidavit in support of the arrest and search warrant described Manriquez's understanding of how Derboghossian had utilized the funding that Manriquez provided, and his remaining collateral:

> Mario De La Fuente Manriquez described Scorch, LLC as a nightclub in Carefree; Mario desired to make his 4 children 50% owners with Nazreth Derboghossian's 5 children possessing the other 50%; Mario and Nazreth Derbogbossian would be executors for their children; Mario would utilize Don Loose to draft wills for both he and Nazreth Derboghossian to reflect the percentage of ownership possessed by the children; Mario possessed 50% ownership, though Jodi [Upton] will own liquor license; Mario would make Jodi a partner so that she has fiduciary responsibility to other partners; Mario indicated that the following percentages would be allotted: Jodi 1%, Nazreth's Children 49%, Mario's children 40%, Mario [Manriquez] 5%, Mario [Mix] 5%; Mario claimed that as of May 31, 2004, $11,000,000 had been loaned from Mario to Nazreth's [children] and Mario's [children]; Mario described a new, unnamed LLC with a superior controlling position to Jodi Upton CBNC, Exotic, and Scorch.

(Doc. 149-1 at 47) (quotations omitted, edits included in brackets and formatting change). Thus, although Manriquez claims to be an innocent lender and objects to being labeled a suspect in the video, such an inference, based on the cumulative evidence obtained by the police, is not unreasonable.  (Doc. 149-1 at 4-74.)

Moreover, qualified immunity will protect a public official if the facts establish that a reasonable person, with the information available to the official, could have formed a reasonable belief that the defamatory statement in question was true and that the publication was an appropriate means for serving the interests which justified the privilege.  Neal, 159 Ariz. at 438, 768 P.2d at 170.  Taken in the light most favorable to the non-moving party, the Court finds that based on the cumulative evidence obtained by the police, the inferences described in the video are not unreasonable and entitle the police officials at issue in Count 13 to qualified immunity.  Consequently, the Court will deny Manriquez's motion for partial summary judgment on Count 13 and sua sponte grant summary judgment to Police Chief Harris and Police Officer Laker on the basis of qualified immunity. See id.  Based on these findings, because there are no facts supporting independent liability by the City of Phoenix,

it also will be dismissed from Claim 13, the state-law defamation claim.

**CONCLUSION**

Accordingly, based on the foregoing,

**IT IS HEREBY ORDERED** granting City Defendants' motion for summary judgment. (Doc. 148.)  The Court grants summary judgment to all of the City Defendants on Counts 1, 3-7, and 12.

**IT IS FURTHER ORDERED** sua sponte granting summary judgment to the remaining City Defendants on Count 13.

**IT IS FURTHER ORDERED** that all of the City Defendants are dismissed from this case.

**IT IS FURTHER ORDERED** granting Campagnolo's motion for summary judgment. (Doc. 151.)  The State of Arizona, Assistant Attorney General Ted Campagnolo and Dawn Campagnolo are dismissed from this case.

**IT IS FURTHER ORDERED** denying Manriquez's motion for partial summary judgment.  (Doc. 154.)

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly and terminate this case.

DATED this 31st day of March, 2014.


Stephen M. McNamee
Senior United States District Judge

- 24 -